**DUNNINGTON, BARTHOLOW, & MILLER, LLP**
Luke McGrath, Esq.
230 Park Avenue, 21st Floor
New York, NY 10169
Tel: (212) 682-8811
lmcgrath@dunnington.com
*Counsel to Prairie Street Capital*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>RICHARDSON FOODS, INC., *et. al.*,<br><br>Debtor. | Chapter 7<br><br>Case No. 20-11203 (JPM)<br>(Jointly Administered) |
| In re:<br><br>RICHARDSON BRANDS COMPANY,<br><br>Debtor. | Case No. 21-10439 (JPM) |
| DEBORAH J. PIAZZA, AS CHAPTER 7 TRUSTEE OF RICHARDSON FOODS, INC. AND RICHARDSON BRANDS COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>KOBI AFEK, FOUNDERS EQUITY I, LP, JOHN TEEGER, WARREN HABER, PRAIRIE STREET CAPITAL, INC., DOGE CAPITAL, LLC, RANDALL TALCOTT, ROSES CONFECTIONS, L.P., ROSES HOLDINGS LIMITED, ROSES RE HOLDINGS, LLC, WEBSTER BUSINESS CREDIT CORPORATION,<br><br>Defendants. | Adv. Pro. No. 22- 01103 (JPM) |

**OBJECTIONS OF NON-SETTLING DEFENDANTS TO PARTIAL SETTLEMENT
AGREEMENT AND RESERVATION OF RIGHTS WITH RESPECT
TO COUNTERCLAIMS AND CROSS-CLAIMS**

TO:    THE HONORABLE JOHN P MASTANDO,III,
        UNITED STATES BANKRUPTCY JUDGE

## Table of Contents

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   FACTUAL BACKGROUND .................................................................................... 1

    A.   Prairie Street was Denied its First Right of Refusal. ........................................ 3

    B.   Instead of Honoring the Right of First Refusal, Webster and Insiders Orchestrate
        an Asset Sale. ................................................................................................. 4

III.  LEGAL STANDARD ............................................................................................. 6

IV.   ARGUMENT ........................................................................................................ 7

    A.   The Settlement Unduly Prejudices Prairie (Who Is Not A Pre-Petition Creditor)
        And Purports to Limit Prairie's Recourse Against Parties Like Afek and Roses –
        Which Recourse Will Unlock RFI and RBC's Insurance. ................................ 7

    B.   This Court Must Weigh the Balance between the Litigation's Possibility of Success
        and the Settlement's Future Benefits. .............................................................. 8

    C.   There is No Likelihood of Complex and Protracted Litigation, "With its Attendant
        Expense, Inconvenience, and Delay," Including the Difficulty in Collecting on the
        Judgment, Except Under the Settlement .......................................................... 10

    D.   The Court Must Consider "the Paramount Interests of the Creditors," Including
        Each Affected Class's Relative Benefits "and the Degree to Which Creditors Either
        Do Not Object to or Affirmatively Support the Proposed Settlement." .................... 11

        i.    The Trustee Has Chosen to Proceed With the RBC Litigation To the Detriment of the
            RFI Litigation. ........................................................................................ 11

        ii.   The Settlement Provides for No Recovery for A Class of Creditors: the RFI Creditors. 12

    E.   The Court Must Assess Whether Other Parties, such as Prairie Street, in Interest
        Support the Settlement—They do not. ............................................................ 15

        i.    The Trustee is pursing the Wrong Party in Interest And Settling With Insiders and
            Wrongdoers. .......................................................................................... 15

        ii.   The Trustee's Claims Against Prairie Have No Substance. ............................... 16

        iii.  The Trustee's claims Against the Settling Parties Would Benefit RFI and    RBC but not
            under this Settlement. .............................................................................. 17

    F.   The Nature and Breadth of Releases to be obtained by Officers and Directors Weigh
        In Favor of Rejection. ..................................................................................... 18

    G.   This Court Must Consider "The Extent to Which the Settlement is the Product of
        Arm's  Length Bargaining." ............................................................................ 20

V.    CONCLUSION .................................................................................................... 21

## Table of Authorities

Page(s)

**Cases:**

327 BR 175 (Bankr SDNY 2005) ................................................................. 8

*Fleet Factors Corp. by Ambassador Factors Div. v. Bandolene Indus. Corp.*,
    86 NY2d 519 (1995) ................................................................. 16

*In re Adelphia Communications Corp.*,
    327 BR 143 (Bankr. SDNY 2005) ................................................................. 8, 10

*In re Drexel Burnham Lambert Group, Inc.*,
    134 B.R. 499 (Bankr.S.D.N.Y.1991) ................................................................. 6

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007) ................................................................. 7

*In re MatlinPatterson Glob. Opportunities Partners II L.P.*,
    644 BR 418 (Bankr. SDNY 2022) ................................................................. 6, 8

*In re Miami Metals I, Inc.*,
    603 BR 531 (Bankr SDNY 2019) ................................................................. 7, 12

*In re Refco Inc.*,
    505 F.3d 109 (2d Cir. 2007) ................................................................. 6

*In re Spielfogel*,
    211 BR 133 (Bankr EDNY 1997) ................................................................. 11

*In re Stanwich Fin. Services Corp.*,
    377 BR 432 (Bankr D. Conn. 2007) ................................................................. 7

*In re WorldCom, Inc.*,
    347 B.R. 123 (Bankr.S.D.N.Y.2006) ................................................................. 7, 20

*Nellis v. Shugrue*,
    165 B.R. 115 (S.D.N.Y.1994) ................................................................. 6

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) ................................................................. 6, 7

**Rules:**

Fed. R. Bankr. P. 9019(a) ................................................................. 15

Fed.Rules Bankr.Proc.Rule 9019 ................................................................. 11

**Other Authorities:**

Section 9-610 of the Uniform Commercial Code ........................................................................ 8, 9

## I.     PRELIMINARY STATEMENT

This is one of those rare moments when the Court must scrutinize a Settlement and reject it because the Settlement is not reasonable; does not benefit the creditors of either Debtor involved (Prairie is not a debtor);  and, among the other reasons discussed below, is not the result of arm's length negotiations.  The factual predicates here are complex – but the simplest way for the Court to proceed is to ask the question:  who benefits here?   The answer to that question is that insiders and insider controlled Roses benefit, while Debtor RFI (as well as RBC); creditors of RFI and RBC; and Defendant Prairie lose significant rights; claims and monies.  The Trustee has completely given up on the RFI creditors.  The RFI creditors are getting nothing out of this Settlement.  That is despite the fact that the Trustee alleged in her Complaint in this adversary proceeding that over $6 million of valuable property was transferred to Roses Confection LP, Roses Holdings Limited and Roses R.E. Holdings LLC (collectively, "Roses").  Tellingly, Kobi Afek ("Afek") was President of RFI and the CEO of RBC prior to March 9, 2020 on which date he quit Debtors and became the CEO of Roses Confection L.P. When a settlement is so lopsided, the Court can take notice and reject the proposed settlement.  If the Court does so, all involved will benefit except perhaps the architects of this current situation: insiders and Roses.

## II.     FACTUAL BACKGROUND

Defendant Prairie Street sets forth the facts below, and additionally relies on the facts set forth in the Complaint, and in the Memorandum of Law of objectors Doge Capital, LLC and Randall Talcott, submitted by White and Williams, LLP.

Pursuant to a Credit and Security Agreement dated as of December 24, 2014 (as subsequently amended, modified, supplemented and restated, the "Credit Agreement") by and among, Richardson Foods, Inc., ("RFI"), Richardson Brands Company ("RBC") and Webster

1

Business Credit Corporation ("Webster"), RFI and RBC borrowed in excess of $3,000,000 from Webster.

Despite initially being appointed as the Trustee of RFI, the Trustee now proposes only settling claims on behalf of the creditors of RBC.

From 1893 until approximately early March 2020, Richardson Brands Company ("RBC") operated its business based in Canajoharie, New York. RBC manufactured a full line of candy products (the "Candy Business") and, more recently, also manufactured a well-known seasoning product called Gravy Master. Around January 2006 Founders Equity formed RFI bought RBC and subsequently several additional companies were purchased by RFI. Some of these acquisitions were supposedly merged into RBC over the years.

Prairie Street was formed in 1996 and has been advising companies and providing growth capital since then. In 2018, Founders approached Prairie Street and asked for help funding Richardson. Prairie Street did so by putting together two investors, DOGE and Talcott who made RFI a loan (the "DOGE /Talcott Loan") on or about February 5, 2018. RFI owned at least one subsidiary – RBC and possibly a second, Bogdon Candy Co. For the Court's convenience we will refer to the combined RFI/RBC and other entities as Richardson; but separately refer to RFI or RBC as the case may be when relevant.

At the time of the DOGE /Talcott Loan, approximately $3.6 million was outstanding under a senior secured facility provided by Webster (the "Webster Facility"). A year after the DOGE /Talcott Loan was made, Richardson was struggling and Webster was losing confidence in management and the owners, Founders. Eventually, Webster wished to reduce the credit limit under the Webster Facility. To avoid that, Founders agreed to post cash collateral. Specifically, Founders, Teeger and another general partner of Founders, Warren Haber ("Haber" and collectively with Founders and Teeger referred to as "the Founders Parties") each made a cash

2

collateral pledge to Webster. Consequently, Webster agreed not to reduce the credit limit to the Company.

By August 2019, Richardson had engaged an investment bank to sell the business, and Webster requested more cash collateral. Prairie Street agreed to provide a pledge then. In the process of documenting the additional cash collateral pledge Prairie Street discovered that the Webster Facility had been modified five times since DOGE and Talcott provided their loans. Prairie Street was not pleased with that finding as DOGE and Talcott were never told of all the amendments. Prairie Street expressed its displeasure and pushed for stronger protections.

Prairie Street's subrogation rights were memorialized in the "Amended and Restated Cash Collateral Deposit Agreement" executed around August 2019 and, again in the "Second Amended and Restated Cash Collateral Deposit Agreement" dated October 24, 2019.

On March 6, 2020, Prairie Street e-mailed Webster no less than three times reiterating its agreement to buy the debt at par. Webster went radio silent and conducted the private sale instead thus denying Prairie Street the benefits of its Right of First Refusal contained in the Amendment No. 9 to Credit and Security Agreement of August 23, 2019.

## A.    Prairie Street was Denied its First Right of Refusal.

On March 4, 2020, Webster and Prairie Street entered into a Non-Disclosure and Confidentiality Agreement ("NDA") in connection with Prairie Street's acquisition of the Webster debt which was secured by all of the Debtors' assets. Pursuant to the NDA, on the morning of March 5, 2020, Webster sent its Sharefile Attachments due diligence file to Prairie Street. Subsequently, Webster produced a draft loan Assignment Agreement and sent it to Prairie Street. Although prior to that time Prairie Street offered to buy the Webster debt at a discount, by March 3, 2020 it was clear that Webster would not sell at a discount and Prairie Street agreed to pay Webster par for its debt. A loan Assignment Agreement was drafted, marked-up and

3

circulated. Prairie Street believed that the parties were working towards a deal to avoid a distressed UCC sale.

Prairie Street was ready, willing and able to purchase the Webster debt at par prior to March 9, 2020. Prairie Street was also prepared to fund operations going forward to facilitate an orderly sales process and requested from Richardson a weekly budget.

**B.     Instead of Honoring the Right of First Refusal, Webster and Insiders Orchestrate an Asset Sale.**

Richardson ceased operating after Afek and the other managers surrendered all of RBC's and RFI's assets to Webster and simultaneously sold by Webster in a private sale on March 9, 2020 pursuant to Section 9-610 of the Uniform Commercial Code (as adopted by the State of New York, the "UCC") to defendant Roses Holdings (the "Sale").

The Sale occurred simultaneity after Kobi Afek ("Afek") and Teeger (Teeger did not sign any of the agreements) voluntarily agreed to give Webster peaceful possession of substantially all of the assets RBC and RFC utilized in the operation of its business other than its real property located at 101 Erie Boulevard, Canajoharie, NY 13317 (the "RBC Assets"). (again, the agreement indicated the assets of both companies were sold and never identified which assets were held by which company)

By letter dated March 9, 2020 from Debtors to Webster, with the subject line "Re: Acknowledgment of events of default, Waiver of Notice, Consent, and Peaceful Possession Letter," Afek and Teeger, on behalf of Debtors, voluntarily agreed to the peaceful possession of the RBC Assets to Webster and consented to Webster's simultaneous private sale of the RBC Assets to Roses Holdings pursuant to UCC § 9-610 without a foreclosure process under the UCC having been initiated.

4

By agreeing to the peaceful possession and a private UCC sale, Afek and Teeger failed to act in the Debtors' best interest. They were not required to agree to the peaceful possession, and at the very least they could have required that an auction sale be held pursuant to the UCC, rather than a private sale to Roses Holdings, particularly in light of the pending offer by "Company C" to purchase Gravy Master alone for substantially more than the price Roses Holdings proposed paying for all of the Richardson Assets.

After peaceful possession and the simultaneous Sale to Roses Holdings was agreed to by Afek and Teeger on behalf of Debtors, Roses Holdings acquired the Richardson Assets other than the Real Property pursuant to a private sale under UCC §9-610, for a purchase price of $3,402,871.86, memorialized by a Secured Party General Conveyance and Bill of Sale (the "Bill of Sale") dated March 9, 2020.

Pursuant to a Purchase and Sale Agreement dated as of March 9, 2020, Roses RE Holdings acquired from RBC the Real Property for the purchase price of $200,000.

In the week prior to the March 9, 2020 UCC sale, Prairie Street was aggressively trying to acquire the Webster debt to preserve more value.

Upon execution of the Bill of Sale, Roses Holdings paid $2,410,871.86 of the purchase price to Webster.

In addition, the Pledgors directly received funds from the Sale of the RBC and RFI Assets, aggregating approximately $891,997.

After its purchase of the RBC Assets from Webster, Roses Holdings continued the same business operations as RBC at the same location, with the same goodwill, RBC's customers, and the same management, personnel, equipment and machinery as RBC.

In May 2020, and subsequently, in light of the Covid-19 pandemic, Roses Holdings applied for Paycheck Protection Program ("PPP") loans that were based on the historical payroll

information for RBC. Roses was not in existence on February 15, 2020, so the only way they

could qualify for a PPP Loan is if there was a defector merger with the predecessor and for Roses

to represent it was a successor to the pre-existing business.

On November 1, 2022, the relevant parties to the adversarial proceedings arising from the

above mediated in an attempt to resolve all matters globally.  This mediation was not successful.

On November 30, 2022, the Trustee moved this Court for an Order approving the

Settlement, which, as discussed below, not only exclude Prairie but also is unfair to RFI and its

creditors (among the other deficiencies discussed below). For the reasons stated below, the Court

should deny approval of the Settlement Agreement or to limit such approval to the Richardson

Brands Company case.

## III.        LEGAL STANDARD

A bankruptcy court's obligation is to determine whether a settlement is in the best interests of

the estate, not to ensure that the creditors' representatives are honoring their fiduciary duties. *See*

*In re Refco Inc*., 505 F.3d 109 (2d Cir. 2007); *Nellis v. Shugrue*, 165 B.R. 115, 121

(S.D.N.Y.1994) (Sotomayor, J.); *In re Drexel Burnham Lambert Group, Inc*., 134 B.R. 499, 505

(Bankr.S.D.N.Y.1991))

Courts have developed standards to evaluate if a settlement is fair and equitable, and, to that

end, courts in this Circuit have set forth factors for approval of settlements based on the original

framework announced in *TMT Trailer Ferry.* "When determining whether a proposed settlement

or compromise is fair and equitable and in the best interests of the estate, courts in this district

consider a series of "interrelated factors" often known as the *Iridium* Factors." *In re*

*MatlinPatterson Glob. Opportunities Partners II L.P.*, 644 BR 418, 426 (Bankr. SDNY 2022);

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414,

88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); Those interrelated factors are: (1) the balance between the

litigation's possibility of success and the settlement's future benefits; (2) the likelihood of

complex and protracted litigation, "with its attendant expense, inconvenience, and delay,"

including the difficulty in collecting on the judgment; (3) "the paramount interests of the

creditors," including each affected class's relative benefits "and the degree to which creditors

either do not object to or affirmatively support the proposed settlement"; (4) whether other

parties in interest support the settlement; (5) the "competency and experience of counsel"

supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the

settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and

(7) "the extent to which the settlement is the product of arm's length bargaining." *In re

WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr.S.D.N.Y.2006); *see also TMT Trailer Ferry*, 390

U.S. at 424, 88 S.Ct. 1157; *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007) (*TMT

Trailer Ferry* factors should be considered in evaluating whether a proposed settlement is fair

and equitable Fed.Rules Bankr.Proc.Rule 9019). It is well established that this Court has the

authority to reject the settlement at issue.

## IV.   <u>ARGUMENT</u>

**A.   The Settlement Unduly Prejudices Prairie (Who Is Not A Pre-Petition Creditor)
And Purports to Limit Prairie's Recourse Against Parties Like Afek and Roses –
Which Recourse Will Unlock RFI and RBC's Insurance.**

The Court should reject the Settlement because it prejudices Prairie – who is not a

creditor.  A Trustee in Bankruptcy cannot purport to impinge the rights of a non-debtor or non-

creditor.  *In re Miami Metals I, Inc.*, 603 BR 531, 535 (Bankr SDNY 2019) (The Second Circuit

has explicitly instructed that when the rights of non-settling parties are implicated by the terms of

a settlement, the court cannot approve it without considering the interests of those non-settling

parties); *In re Stanwich Fin. Services Corp.*, 377 BR 432, 437 (Bankr D. Conn. 2007) (The

Second Circuit has instructed that when the rights of non-settling parties are implicated by the

terms of a settlement, the court cannot approve it without considering the interests of those non-settling parties). Here, the Settlement purports to limit Prairie's ability to pursue Settling Defendants for claims Prairie holds against them. *See* Trustee Motion Exhibit A at pg. 25-27. The Settlement also releases claims instead of tapping into the RFI/RBC D&O insurance that is available here. *See* Exhibit A. Any settlement that impinges Prairie's rights is patently improper without the consent and approval of Prairie. *In re MatlinPatterson Glob. Opportunities Partners II L.P.*, 644 BR 418, 426 (Bankr. SDNY 2022) (Before approving proposed settlement, bankruptcy court must determine that it is fair and equitable and in best interests of estate). Yet, the Trustee – with no evidence to support its justification and no cases in support – is asking the Court to approve this action.   The Court should do the opposite.

Similarly, the Court should reject the Settlement because it forgoes the cash collateral payments here (as discussed in more detail below).  A Court can reject a settlement that unreasonably leaves money on the table. *In re Adelphia Communications Corp.*, 327 BR 143, 158 (Bankr. SDNY 2005), adhered to on reconsideration, 327 BR 175 (Bankr SDNY 2005). Here, the Trustee is releasing claims to the balance of the cash collateral payments.  To justify this position, the Trustee claims the cash collateral agreement was faulty and intimates that the trustee can assert claims against Prairie – but that is not the reality and will simply trigger additional litigation with no likelihood of success.  Instead of Prairie, the Trustee should be going after Webster because the bank is the one who paid Prairie – and it is the Bank who would then have liability here.

**B.     This Court Must Weigh the Balance between the Litigation's Possibility of Success and the Settlement's Future Benefits.**

The balance between the litigation's possibility of success and the settlement's future benefits weighs heavily against approval here.  As set forth above, Prairie Street provided

8

secured loans to RFI and RBC conditioned on a Right of First Refusal, but through the machinations of insiders like Afek and insider controlled Roses, the Right of First Refusal – which would have pumped money into RFI and RBC was thwarted and breached. *See* Declaration of Michael Barry (MB Decl.) at 14, 51. As an equity stakeholder in RFI and (and therefore) RBC, Afek had a responsibility to secure the most for the secured and unsecured creditors -- not to pave the way for his next job. If Prairie had been allowed to purchase the loans, the likelihood of full collection for all creditors was quite high. The Settlement Agreement will bar Prairie and the creditors from pursuing any of these claims against Afek and Roses. *See* MB Decl. at 59.

There is a possibility of success in pressing litigation here for greater returns. In other words, the benefits of the settlement are outweighed because the Trustee is settling with the wrong parties. Under this Settlement, there is likely no recovery – even the Trustee admits that there is no money for creditors but only for his fees. Insiders and insider controlled Roses created this situation by breaching their duties, but the Settlement Agreement rewards them instead of seeking to claw back the money and value they have taken. Here, without this Settlement, the trustee can recoup more funds from the Settling Parties, deputize Prairie to pursue the wrongdoers at no cost to the Estate and benefit all creditors – not just the insiders. Accordingly, objector Prairie requests the Court reject the Settlement Agreement and allow for the RFI creditors and Prairie to pursue claims against, among others, Webster, Roses and the RFI and RBC insiders (alongside or on behalf of RFI and RBC) – including but not limited to claims that trigger the insurance coverage extent here benefiting RFI and RBC.

Because the Settlement Agreement reduces the recovery for the estates; creditors (and Prairie) without any upside for the real stakeholders here (but benefits insiders) the Court should reject the Settlement agreement.

C.     **There is No Likelihood of Complex and Protracted Litigation, "With its Attendant Expense, Inconvenience, and Delay," Including the Difficulty in Collecting on the Judgment, Except Under the Settlement**

There is no likelihood of complex litigation because there is no dispute regarding the

contractual obligations under the Right of First Refusal and the bad acts of the insiders here.  A

Court's analysis of the likelihood of complex or protracted litigation involves assessment of

whether a proposed settlement or compromise is fair and equitable and in the best interests of the

estate and whether judgment may be collected. *In re Adelphia Communications Corp.*, 327 BR

143, 158 (Bankr. SDNY 2005). Here, Prairie Street was ready, willing and able to purchase the

Webster debt at par prior to March 9, 2020.  Prairie Street was also prepared to fund RFI and

RBC operations going forward to facilitate an orderly sales process and requested from

Richardson a weekly budget. MB Decl. at 15.  Michael Barry sent Afek an e-mail on March 3,

2020 in which Afek was informed that Prairie Street intended to purchase the Webster debt and

proposed an alternative capital structure.  MB Decl. at 12.  The Trustee fails to consider that

Afek had equity appreciation rights ("phantom equity") in Richardson and has equity

appreciation rights in Roses in the form of "Class B stock." MB Decl. at 31**.**  Webster told Prairie

to purchase the Webster Credit Agreements to avert a foreclosure sale to Roses, Prairie accepted

the offer from Webster and was simply waiting for Webster to fill in the dollar amounts and

provide wiring instructions.  MB Decl at 51.  Instead, as we know and as will be easily

demonstrated in any litigation, the Settling Parties thwarted this transaction and "in secret"

assigned some of the assets of RFI and RBC over to Webster who in-turn sold them to Roses.

MB Decl. at 51. Other assets were conveyed directly by RFI and RBC to Roses. *Id* .   Thus, the

Court can easily determine that a Settlement that has zero value for creditors (and is otherwise

deficient as discussed herein) is not better here than litigation that will result in insiders and

others giving back monies and value to the estates for the benefit of creditors – especially where,

as here, Prairie is prepared to step in to lead that charge.    Accordingly, the Court should reject

the Settlement.

**D.**    **The Court Must Consider "the Paramount Interests of the Creditors," Including Each Affected Class's Relative Benefits "and the Degree to Which Creditors Either Do Not Object to or Affirmatively Support the Proposed Settlement."**

>    i.    *The Trustee Has Chosen to Proceed With the RBC Litigation To the Detriment of the RFI Litigation.*

The Court should reject the Settlement because it fails to prioritize the "paramount

interests of the creditors" and, instead, benefits insiders and certain insider controlled creditors as

compared to the unfair treatment to the creditors of RFI weighs heavily in favor of rejecting this

Settlement. *In re Spielfogel*, 211 BR 133 (Bankr EDNY 1997) (The court held that settlement

would not be approved, as not being fair and equitable to debtor. While bankruptcy court may

consider trustee's opinion in deciding whether to approve proposed settlement, court must make

independent determination and cannot simply accept trustee's word that settlement is reasonable

or merely rubber stamp trustee's proposal. The court rejects the compromise and settlement, as

proposed, as not meeting the standard of being fair and equitable and in the best interests of the

estate).

The Court must note that the Trustee is supporting a settlement that benefits certain

creditors over others and also benefits the creditors of RBC over the creditors of RFI.  *See*

Chapter 7 Trustee's Motion Pursuant to Fed. R. Bankr. P. 9019(a) for Approval of Stipulation of

Partial Settlement of Adversary Proceeding {ECF No. 28} ("Trustee Motion").   Indeed, a

comparison of the two adversarial proceedings (RFI proceeding as compared to the RBC

proceeding) shows the Court that the Trustee focused on RBC (to the detriment of the claims in

the RFI proceeding).   In fact, the Trustee could have asserted many if not all of the claims

against the Settling Defendants in the RFI case as opposed to the RBC case, however, the trustee

11

chose to pursue one case over the other.  As this Court knows, the U.S. Trustee appointed the

Trustee here on January 15, 2020 to represent the interests of the RFI creditors.  It was only after

being appointed that the Trustee decided to put RBC into bankruptcy – in the Trustee's own

words to protect the RFI creditors.  *See* Trustee's Motion, pg. 8 ("On March 8, 2021, in order to

preserve RBC's claims for the benefit of RFI, the Trustee as sole stockholder of RBC, filed a

voluntary Chapter 7 petition on behalf of RBC").  However, the result is the opposite, the RFI

creditors are left with nothing in this Settlement while insiders and RBC creditors recover – this

make no sense.

The Trustee is now aggressively trying to recover monies from the same RFI creditors

she was appointed to represent and is hoping to enter into a Settlement that takes away the rights

of the RFI creditors to pursue any claims against the Settlement Parties.

> ii.     *The Settlement Provides for No Recovery for A Class of Creditors: the
> RFI Creditors.*

The Court should reject the Settlement because it gives the RFI creditors no recovery.  A

proposed Settlement that unfairly benefits one class of creditors and unduly prejudices another

class should be rejected.  *In re Miami Metals I, Inc*., 603 BR 531, 535 (Bankr SDNY 2019):

("Notwithstanding the above factors, the Second Circuit has explicitly instructed that when the

rights of non-settling parties are implicated by the terms of a settlement, the court cannot approve

it without considering the interests of those non-settling parties").  Here, the RBC Creditors –

and insiders – unfairly benefit while, at the same time and for no good reason – the RFI creditors

are left with nothing.  The RFI creditors in aggregate filed claims of approximately $1.6 million.

Most of these claims were properly secured claims.  The Proposed Settlement provides nothing

for the RFI claims, and instead provides a windfall and releases to the Settling Defendants who

would have had to contribute monies to the RFI Estate in order to resolve the RFI claims against

them (but do not have to do so under this proposed Settlement). Accordingly, the Court must

reject the settlement as providing a windfall to Settling Defendants while "zeroing out" the RFI

creditors.

To justify this unfair treatment, the Trustee asserts that she cannot collect any funds for the

benefit of the RFI creditors' claims because RFI had no assets except for an equity interest in

RBC. *See* Trustee's Motion at pg. 10 ("The sale proceeds from the private sale to Roses all came

from RBC's assets. No assets of RFI were sold nor did RFI have any assets other than its equity

interest in RBC"). This simply is not true, as listed below:

a) RFI has D&O Insurance. As stated in the Declaration of Michael Barry, Objectors

   believe the insurance available to RFI provides up to $1.5 million in coverage – that by

   itself a valuable asset;

b) RFI's tax returns show assets. RFI filed a federal tax return in 2016. This federal tax

   appears to be based upon an accounting of the company as a standalone entity (i.e. not as

   an aggregate entity with RBC). This RFI Tax Return is the only tax return ever presented

   in these proceedings and is uncontroverted. The uncontroverted evidence provided by

   this RFI Tax Return demonstrates that RFI has assets – which the trustee has not

   marshaled for the benefit of the RFI creditors.

c) The RFI assets include more than $17 million in assets above and beyond the equity

   interest in RBC. The RFI Tax Return shows RFI had assets of approximately $34

   million. *See* Exhibit A. One item was indeed the investment in RBC. *See id* (showing

   RBC investment). Significantly, however, the RFI Tax Return also discloses

   $17,090,092 of other RFI assets – including receivables that make RFI a creditor of RBC

   – not just an equity holder. RFI had loaned RBC monies of which RBC paid down

   $593,320 of the balance during 2016. This financial statement certainly demonstrates that

RFI has considerable assets which the Trustee has not attempted to collect and will

necessarily abandon under the proposed Settlement if the Court does not reject the

Settlement.  *See* Exhibit A.

d)  RFI has Claims against Settling Parties.  The Trustee also fails to account for the claims

RFI could assert (and has asserted) against the Settling Parties and others.  RFI's claims

include but are not limited to a right of first refusal claim of Prairie Street against

Webster, a breach of contract claim against Roses, unjust enrichment claims against

Founders, Teeger, Haber (and possibly others), successor liability claims against Roses,

equitable subordination claims against Founders, Teeger, Haber, and declaratory

judgment claims.  Under the Settlement, RFI gets nothing but releases all claims against

parties that woe RFI monies.  *See* Trustee Motion Exhibit A.

The Trustee never submitted a claim against RBC on behalf of RFI or the RFI creditors on or

before the bar date in the RBC bankruptcy.  The Court must recall that the trustee was the one

who "decided" to put RBC in bankruptcy in the first place – ostensibly to benefit the RFI

creditors – but then did not file a claim in that bankruptcy to recover monies from RBC for the

RFI Estate.  The Trustee has done nothing to amend this error.  Now, in support of the

Settlement, the Trustee asserts that there are no assets in RFI despite evidence listed above to the

contrary.

The Trustee relies upon a representation of Afek in which Afek asserts that RFI had no other

assets except the investment in RBC.  *See* Exhibit B Afek 341 Hearing and Form 202[1].  The

Court should give this assertion no weight.  Afek is an insider who benefits form the Settlement

and who controls Roses – a significant beneficiary under the Settlement.  Further, Afek

---

[1] Audio file of 341 Hearing available at Court's request.

demonstrated, at best, a faulty recollection in his deposition.  *See* Exhibit B.  Afek could have

provided documentary evidence to corroborate this statement (such as subsequent tax returns or

books and records of RFI) provided no such evidence here.  Indeed, Afek's recent statement is

directly contradicted by Afek's testimony during his 341 hearing.  Under oath during the 341

examination, Afek stated that there was no separate accounting of RFI and RBC and that all

accounting (and thus accounts) were commingled.  In this vein, Richardson repeatedly presented

the consolidated financial statements (both RFI and RBC together) when 3rd parties requested

the financials of RFI or RBC separately and for internal management reviews.  *See* Exhibit B

341 Hearing.   In other words, because RFI and RBC presented consolidated financials and

comingled assets neither the trustee, nor Afek can assert RFI had no assets because RFI's assets

were the same as RBC (and each of the Trustee and Afek acknowledge RBC has assets).  In fact,

as mentioned above, Afek himself filed a claim against RFI and as proof he attached a printout

from this same system which showed RBC owed him monies but which he claims were actually

a liability of RFI.  *See* Exhibit B.

**E.     The Court Must Assess Whether Other Parties, such as Prairie Street, in Interest
          Support the Settlement—They do not.**

The Court should reject this Settlement because the other parties in interests object to the

Settlement.  The other party in interest here is Prairie (as well as the other objecting creditors

Doge Capital, LLC and Randall Talcott).

As discussed above, the RFI creditors of which Prairie, Doge and Talcott represent 81% are

unfairly and unduly prejudiced by the Settlement.

    *i.*        *The Trustee is pursing the Wrong Party in Interest And Settling With Insiders and
          Wrongdoers.*

As discussed above, the Trustee favored the RBC case over the RFI claims.  The Trustee

could have asserted many if not all of the claims against the Settling Defendants in the RFI case

as opposed to the RBC case. She chose, however, to pursue only the RBC case. By doing so she abandoned the RFI creditors on the one hand, but on the other she is prejudicing those same creditors by releasing the Settling Parties and pursuing Prairie --- even while Prairie is seeking (and has sought) to benefit RFI.

ii.    *The Trustee's Claims Against Prairie Have No Substance.*

A basic misconception underlying the Trustee's actions here is the misconception that the monies Prairie received (that are the subject of the trustee's claims against Prairie) were not secured. This is misguided. The subrogation agreement between RBC, RFI and Webster secured Prairie's position. The Trustee asserts that Prairie never filed a UCC-1– but that misses the point because Webster did make all the required UCC filings – and those filings inured to the benefit of Prairie. *Fleet Factors Corp. by Ambassador Factors Div. v. Bandolene Indus. Corp*., 86 NY2d 519, 523 (1995) ("The secured party who first files a financing statement is deemed to have the senior security interest. The Secured creditor was not required to refile financing statement upon debtor's subsequent name change"). Prairie had an agreement directly with Webster. Exhibit C Subrogation Agreement; Prairie submitted the cash collateral to Webster; and Webster kept control over that cash collateral. *See id*. In the end, it was Webster who distributed the funds back to Prairie – not RBC, RFI or even Roses. Accordingly, Prairie did not take any monies from either Debtor and if the Trustee has any issues with how Prairie received funds from Webster, the Trustee should be challenging Webster instead of releasing Webster under the Proposed Settlement for merely $25,000.

Prairie agreed to the cash collateral in return for several concessions. One which was the first right of refusal to buy the Webster Credit Agreements, and this was agreed to by Webster, RFI and RBC – all three parities executed this agreement. Webster told Prairie to purchase the Webster Credit Agreements to avert a foreclosure sale to Roses, Prairie accepted the offer from

16

Webster and was simply waiting for Webster to fill in the dollar amounts and provide wiring instructions. Instead, Webster – in apparent collusion with Roses and the other Settling Parties – reneged on the right of first refusal and orchestrated a foreclosure/assignment and sale of the assets. This transaction did not benefit RBC or RFI – but did benefit the Settling Parties.

The Trustee seems to think she can hit the "jack pot" by dogging the Prairie Parties. The fact is she agreed to settle the claims against Founders, Teeger and Haber which, depending upon if the insurance is paying their settlement or note, will recover 81.7% or 50.9% of the monies they were owed. Right now the Prairie Parties have recovered only 44% and this would only be reduced with any settlement payments.

      iii.     *The Trustee's claims Against the Settling Parties Would Benefit RFI and RBC but not under this Settlement.*

Objector Prairie believes the events concluding in the sale of assets to Rose form the basis for claims such as breach of contract, tortious interference, lender and officer liability. Prairie has offered the Trustee these claims to help her recover more for the RFI and RBC creditors, but she has declined. More relevant to this filing, the Settlement Agreement reduces the recourse Prairie has against the Settling Parties, as well as derivative claims the creditors of RFI and RBC may have – but for no valuable consideration.

As asserted in the Declaration of Michael Barry, Founders, Haber and Teeger did not want Prairie to control the loans as they were afraid they might not get their cash collateral back. *See* MB Decl. at 53. Prairie was clear with them that their monies should likely be equitably subordinated. *See id.* However, Prairie did not know if Webster would include the pay-off of the cash collateral amount in the final pay-off to be wired to purchase the Credit Agreements. Either way, however, Prairie was prepared to close and Founders, Haber and Teeger (and Afek, but for

17

different reasons) all feared what Prairie might do, so they blocked the sale of the loans. *See* MB Decl. at 53.

As asserted in the Michael Barry Declaration, the Founders, Haber, Teeger and Afek violated the responsibilities they had to the RFI and RBC creditors and also to Prairie. MB Decl. at 54. Success in pursing these claims will give Prairie and the other creditors' access to the RFI and RBC D&O insurance (which provides approximately $1.5 million in coverage). This Settlement Agreement blocks Prairie and the RFI and RBC creditors from any of these proceeds – but to no benefit.

The Settlement Agreement unnecessarily harms the RFI creditors and possibly the RBC creditors as well – but provides them with no recovery. According to the Trustee, even under this Settlement, there is no money for creditors but only for the Trustee's fees. The alternatives provided by Prairie – and the facts before the Court lead to a different conclusion: Prairie and RFI can recover monies from the Settling Parties for the benefit of the RFI and RBC creditors – those that are not benefitting from the insider deals that have already destroyed RFI and RBC. Since the Settlement Agreement weakens the claims Prairie has against the Settlement Parties without any proper hearing of these claims we urge the Court to reject the Settlement Agreement in full.

**F.      The Nature and Breadth of Releases to be obtained by Officers and Directors Weigh In Favor of Rejection.**

This Court must consider the nature and breadth of releases to be obtained by officers and directors in this Settlement. Not only is Afek is getting a release and Roses, who is controlled by insiders is additionally getting a release. This Court could approve settlement for Founders, Haber and Teeger, but carve out any claims against Afek. The Trustee also suddenly now disparages the strength of her successor liability claim against Roses. But this is contrary to the

submission where the Trustee states that Roses paid antecedent debts, continued the operation of the same business with the same people, and bought the assets at a bargain purchase price. There was indeed a continuation of equity. Afek was asked by the Trustee if he had any equity in Richardson and Afek indicated he did not. He was requested to supply his employment agreement, which we believe he never did. But the Prairie Parties have a copy of Afek's employment agreement and so does the Trustee, but she seems to be ignoring this in her analysis.

Through government filings and the deposition of Bret Meyers of Roses, the Trustee should be aware that Afek was "gifted" valuable equity in Roses. As such, there was clearly a continuation of equity. The Trustee is allowing Afek to walk away from all liability and retain his valuable equity interest in Roses. This is unconscionable.

Given that the RFI and RBC creditors hold roughly $2 million of claims against the Debtors, the settlement requiring Roses to pay only $125,000 is also unconscionable. As such, we request the Court to intervene to protect the creditors of RFI and RBC by denying approval of the Settlement Agreement with Roses and Afek.

We also ask the Court to assure that the RFI creditors and Prairie have the right to pursue claims against Webster, RFI and RBC management for potentially interfering in Prairie's attempts to purchase the loans (which it had a contractual right to).

Afek might also have additional culpability for interfering as we believe he communicated to Roses what Prairie was planning on doing. As a result, Roses rushed the March 9th transaction (as evidenced by the agreement wrongly naming Prairie in place of Doge in numerous locations) and we believe pressured the bank along with Founders, Haber and Teeger to sell the assets to Roses. As an equity stakeholder in RFI and (and therefore) RBC, Afek had a responsibility to secure the most for the secured and unsecured creditors -- not to pave the way for his next job. If Prairie had been allowed to purchase the loans, the likelihood of

full collection for all creditors was quite high. The Settlement Agreement will bar Prairie and the creditors from pursuing any of these claims against Afek and Roses.

**G.      This Court Must Consider "The Extent to Which the Settlement is the Product of Arm's Length Bargaining."**

The Court should reject this Settlement because the facts before the Court indicate that this Settlement was not the product of arm's length negotiations.    Without arm's length negotiations the Court must reject a Settlement – especially if the settling parties include insiders. *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr.S.D.N.Y.2006).    Here, the following facts weigh heavily in favor of a finding that the Settlement was not at arm's length:

First, the Settlement creates a conflict in which the Trustee's professionals (i.e. the Trustee's law firm) is obligated to do legal work for Roses at a discounted rate.    Specifically, the Trustee is assigning Roses certain claims and the resulting monetary benefits, if any, that could have accrued to the creditors.    In this regard, under the Settlement Agreement, it appears that the Trustee has negotiated for the Trustee's lawyers to undertake legal work for Roses at what appears to be a discounted rate.    (Trustee's lawyers are now working for Roses and being paid $10,000 under the Settlement Agreement at p. 25).    The Court should scrutinize this aspect of the Settlement because it demonstrates that the trustee 9or at least the Trustee's professionals) are not at arm's length with Roses.

Second, the Settlement Agreement assigns valuable claims to roses for Roses benefit – even though Roses is not owed any money but instead owed Debtors money (as discussed below).

Third, Roses and the other Settlement Parties get off easy.

On March 9, 2020, Roses agreed to pay RFI a portion of the collected account receivables. *See* MB Decl. at 22-24.  Of that amount, Roses deducted at least $244,341.92 which

20

is still outstanding. *See id*.  Similarly, under the Agreement dated March 9, Roses agreed to

submit 70% of the amounts owed, or $171,039, but Roses has not done so and still owes RFI this

amount.   For no good reason the trustee has agreed to release Roses from this obligation in

exchange for $125,000.  This discount of at least $46,039 is unreasonable and again is in

detriment to (instead of for the benefit of) the RFI estate and the RFI creditors.

<strong>V.        CONCLUSION</strong>

WHEREFORE, Prairie Street Capital, Inc., Doge Capital, LLC and Randall Talcott

respectfully ask the Court to deny approval of the Settlement Agreement or to limit such

approval to the Richardson Brands Company case and grant such other and further relief as is

just and proper.


DATED:        New York, New York
              December 14, 2022




                                              Respectfully submitted,



                                              DUNNINGTON, BARTHOLOW, & MILLER, LLP
                                              Luke McGrath, Esq.
                                              230 Park Avenue, 21st Floor
                                              New York, NY 10169
                                              Tel: (212) 682-8811
                                              lmcgrath@dunnington.com

                                              *Counsel to Prairie Street Capital*